# Johnson v. Commonwealth.

Sept. 29, 1939.

Robert R. Friend, Special Judge.

Carl D. Perkins, Walter Gardner and L. J. May for appellant.

Hubert Meredith, Attorney General, and Wm. F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

The appellant, an illiterate seventeen year old boy, was jointly indicted with his grandfather, John Newman, his uncle, Gladys Newman, Jarvey McCoy, and D. K. Newsom, for the murder of Ishmael Hopkins which occurred on February 16, 1938. D. K. Newsom had lived for fifteen years with one of John Newman's

daughters, and McCoy was married to another daughter. Tried separately, appellant was found guilty and sentenced to the penitentiary for life. The indictment also contained a count charging conspiracy to murder but no complaint is made here as to the sufficiency of the indictment. In fact, appellant's counsel in his brief complains only of the alleged failure of the Court to instruct on the whole law of the case and its refusal to grant a change of venue.

The defense at the trial was that the appellant shot Hopkins in order to save his life and that of his grandfather with whom he resided and on whose premises the killing occurred. Since it is not contended that the verdict is not supported by evidence sufficient to sustain it, or that the Court erred in the admission or rejection of testimony, we shall refer to only so much of the testimony as is necessary to the determination of the legal questions involved.

According to appellant's testimony, he and his uncle, Gladys Newman, a boy of about the same age, were talking together on the porch of the residence of the grandfather. It was near nightfall, and the grandfather, who had gone with Newsom to the chicken house, called to appellant to come and "see what the dogs were barking at," whereupon he took his pump shotgun, which he says he always carried with him, and together with Newman, who took with him a .22 caliber rifle, joined his grandfather and Newsom. In endeavoring to learn why the dogs were barking, they came upon Ishmael Hopkins, married, and the father of four children, and Herald Hall, a nineteen year old boy. We quote the following from appellant's testimony:

"A. We went out to see what the dogs was barking at and walked upon these fellows out there. We were all out there and run up on these fellows and the old man said, was that you Ham, and he said his name to John and he said, 'I got you right where I want you.'

"Q. 38. Talk loud. A. We went out to see what the dogs was barking at and the old man asked 'Is that you Ham?' and he said, 'No, is that you John?' and he said 'Yes,' and he said 'I got you right where I want you,' and the old man said, 'Get off my possessions,' and he said 'Lets talk just a minute,' and before that minute was out they begun shooting.

"Q. 39. Who did? A. Ishmael.

"Q. 40. What was he shooting? A. A pistol.

"Q. 41. What happened then? A. He knocked the old man down and I shot.

"Q. 42. Then what happened? A. I commenced shooting when he knocked the old man down.

"Q. 43. What were you shooting? A. A pump shot gun.

"Q. 44. Did anybody else shoot there? A. Yes, Gladys Newman fired once or twice."

It should be noted that appellant disclaimed any knowledge that Hopkins was to be there that night, admitting that he knew Hopkins well and had been frequently with him. We quote further:

"Q. 68. State whether or not that at the time you fired that shotgun you would have fired if you hadn't thought he had killed your grandfather and that he might kill you? A. No, sir."

John and Gladys Newman, the only witnesses to the actual killing introduced by appellant, gave substantially the same account of the tragedy.

For the Commonwealth, Herald Hall, who accompanied Hopkins on the fatal day, testified that he met Hopkins about noon near the mouth of Dry Creek in Knott County about three and a half miles from John Newman's house; that he accompanied Hopkins to Buckingham in Floyd County, a distance of four miles, in order to purchase whiskey; that they remained in Buckingham about thirty minutes and then came back "around the hill" to a spring located on John Newman's place where Hopkins was to meet the fourteen year old granddaughter of John Newman; that they waited at the spring from fifteen to twenty-five minutes for the girl, who, however, failed to keep the appointment; that upon leaving the spring they started to Daniel Hall's place to get whiskey (although their real object seems to have been to find the girl); that they started up the hill on the path on John Newman's property, and after proceeding about 100 feet came upon John Newman and his companions. To use his own words:

"A. We started on up the hill and Ishmael looked up the hill and said he thought he saw some-

body. We went up there—About the time he said that John raised up and said, 'Is that you Ham,' and Ishmael said, 'No, it is me,' and John said, 'Me, who, by God,' and Ishmael said 'Ishmael Hopkins,' and they all raised up and Ishmael said 'Boys, what does this mean, are you going to kill me, what have I done?' And they said 'You know what you have done. You've been fooling with these girls out here.' And he said 'Who told you that?' and he said, 'The girls did.'

"Q. 40. Who said that to him? A. John Newman. And he said, 'Go back around the hill—

"Q. 40. Tell the exact words he used? A. He said, 'Go back the way you come and walk straight.'

"Q. 42. What did Hopkins say? A. He said, 'I will take you at your word.'

"Q. 43. Did he start away? A. Yes, and they started shooting."

D. K. Newsom, introduced as a witness for the Commonwealth, after the indictment against him had been dismissed on motion of the Commonwealth's Attorney, testified that John Newman had two of his young daughters and his granddaughter living with him; that on the morning of the day of the killing, the witness had been to John Newman's home for the purpose of helping him kill a hog, and that Newman said something about the girls going out the night before and that he was going "out there where the girls went the night before" and "would fill the date for them;" that on a previous occasion John Newman had told him that the girls had said that they had been with Ishmael Hopkins and Herald Hall. The witness then proceeded:

"I come around there and had dinner with John and John said, while I was eating dinner, that somebody had to die tonight if it had to be old John. And that night he gave me the 32 rimfire rifle and a 32 automatic pistol and he peeled some shells and gave them to Herald Johnson and told him to try them in the gun and we started and went on around the hill and set there about ten or fifteen minutes and the boys come up and John said, 'Is that you Ham?' and Ishmael said 'No, it is Ishmael Hopkins.' John said 'You got no business here,' and Ishmael said 'I am in the dark about this,' and he

said 'Go on around the hill and walk straight,' and Ishmael said 'I will take you at your word,' and he walked about fifteen steps and John said, 'Shoot him boys,' and they started shooting and I started around the hill and eight or ten shots were fired and in three or four minutes some more shots were fired.''

Edith Hall, the granddaughter of John Newman, stated that she and the other girls, Martha, Mary, and Edna, the latter of whom was the fourteen year old sister of the appellant, had met Herald Hall and Ishmael Hopkins in the fields and woods near the residence on several occasions, and that each time Hopkins had said he was going to ''get me or kill my grandfather and the boys.'' However, it should be noted that John Newman testified that while he ''guessed'' that Hopkins was ''trying to take my granddaughter,'' he had nothing against him, was friendly with him, had no knowledge that he was coming to the place on the night he was killed, and that his only purpose in leaving his home that night was to lock up the chicken house.

It will thus be seen that Hopkins' mistreatment of the young female relatives of the accused did not enter into appellant's defense but was used by the Commonwealth to establish a motive for the killing, and that the appellant based his whole case on his contention that he shot Hopkins in what he believed to be the necessary defense of his grandfather and himself.

The Court, in addition to giving the usual instructions on self defense and voluntary manslaughter, instructed the jury as follows:

''If the jury shall believe from the evidence that at the time the defendant, Herald Johnson, shot and killed Ishmael Hopkins, if he did so or aided or abetted therein, he believed and had reasonable grounds to believe that he or either of the other defendants were then and there in danger of death or the infliction of some great bodily harm at the hands of said Ishmael Hopkins and that it was necessary or was believed by the defendant in the exercising of a reasonable judgment to be necessary to shoot the deceased or to aid and abet therein in order to avert that danger real or to the defendant apparent then you will acquit the defendant upon

the grounds of self defense, defense of another or apparent necessity."

Appellant's counsel contends that the court should have instructed the jury that the appellant had the right to defend his home or the inhabitants of that home, and, in another part of his brief, that the court should have instructed "that the defendant had the right to use such force as was necessary to eject the intruder from entering the property where the deceased had in mind to commit a felony even to the extent of taking his life."

We know of no authority which in view of the evidence contained in this record would have required or justified the giving of an instruction that the appellant had the right to defend his home or the inhabitants of that home. There was no evidence that the home was in danger on the night of the killing or that the inhabitants of the home, other than those who were with the appellant at the time of the shooting, were in any danger. By the instruction given, the court in apt language told the jury that the appellant had the right to shoot Hopkins if he believed or had reasonable grounds to believe that those who were with appellant were then and there in danger of death or some great bodily harm at the hands of Hopkins, and that in the exercise of a reasonable judgment it was necessary to kill Hopkins in order to avert that danger. Clearly this instruction properly defined the appellant's right to defend those who were in real or apparent danger from Hopkins and was the only instruction to which the appellant was entitled on this subject.

Neither can we agree with appellant's counsel that the Court should have told the jury that appellant had the right to eject, or prevent the deceased from entering the property where he "had in mind to commit a felony." The only felony which any of the evidence shows that the deceased had any intention of committing on the occasion when he was shot was the infliction of death or great bodily injury upon John Newman, and this phase of the case was fully covered by the instruction quoted. As to the contention that the appellant had the right to kill in order to eject the intruder or to prevent him from entering the property, it is sufficient to say that it has never been the law of this state that an owner has the right to kill another for merely trespassing on his premises, although he may do so, if necessary to pre-

vent an unlawful forcible entry into his dwelling. Carroll v. Commonwealth, 221 Ky. 557, 299 S. W. 183, and authorities there cited. The case of Sawyer v. Commonwealth, 227 Ky. 435, 13 S. W. (2d) 267, cited in the brief of appellant's counsel does not militate against this rule. In fact, it cites the case of Carroll v. Commonwealth, supra.

Since there was no evidence that Hopkins entered or had any intention of entering John Newman's dwelling, we are compelled to hold that the instructions given were proper and covered the whole law of the case.

The remaining complaint of appellant's counsel, namely, that the court erred in refusing to grant a change of venue, requires a summary of the testimony heard on the application.

On March 8, 1938, the date on which the indictment was returned, the appellant and those indicted with him filed a petition for a change of venue. The grounds stated were in substance that the deceased was a son of a resident of Knott County who had a large family connection by blood and marriage with the most influential and prominent people of the County, several of whom held public office in the judicial district, and all of whom would wield undue and powerful influence with any jury impanelled within the district and thus prevent the accused from securing a fair and impartial trial; that the accused had been arrested and confined in jail; that they had not been permitted to jointly converse or advise with their counsel, and had only been permitted to talk with their counsel separately and in a cell in the jail; that the influence thus wielded prevented an attorney they had secured from appearing at the examining trial where those who had an examining trial were forced to give evidence to which they objected; that the persons who attended the examining trial were searched in order to prevent violence; that the Circuit Judge and Commonwealth's Attorney were related to the deceased; that the feelings of the friends, relatives, and associates of the deceased were so extremely hostile and bitter toward the accused that unknown persons had intimidated, harrassed, and annoyed their friends who were trying to assist them in their defense; and that their witnesses were afraid to attend the trial and testify to the facts in the case.

In its response the Commonwealth denied these al-

760

legations but by an amended response admitted that the Commonwealth's Attorney was a first cousin and that the Circuit Judge was a fourth or fifth cousin of the father of the deceased.

In support of the petition the accused filed the affidavits of Wootsie Conley and Hiram Watts that they had read the petition and believed that the statements contained therein were true; also the affidavits of Mrs. Jarvey McCoy, Melvin Moore, Bill Osborne, and America Newman. The affidavit of Mrs. McCoy was to the effect that the lawyer whom she had employed to defend her husband at the examining trial had refused to do so because of the bitter feeling against the accused; that her husband's co-defendants, when called by him as witnesses at the examining trial to prove that he was not present at the scene of the killing, had been forced to testify as to the merits of the case; that after leaving Hindman following the examining trial, some unknown parties in a truck had followed and repeatedly driven by the car in which she was riding, tried to wreck the car, and pointed pistols at it, and that since that time she had had difficulty in getting anyone to accompany her to Hindman. The affidavit of Melvin Moore was to the effect that he had been bribed by one Willie Johnson to testify falsely against Jarvey McCoy at the examining trial; and the affidavits of Bill Osborne and America Newman disclosed that they had witnessed the occurrences on the road from Hindman related by Mrs. McCoy in her affidavit. On March 15th the court ordered an oral hearing on the affidavits, and at its conclusion overruled the motion for a change of venue. At the hearing Mrs. McCoy admitted that after the occurrence on the road related in her affidavit no one had attempted to molest her in any way, and that the lawyer who had refused to represent her husband was a Floyd County lawyer and that she had never tried to employ a lawyer in Hindman; Wootsie Conley, who, at the time, was under indictment for a felony, repudiated his affidavit filed with the petition by stating that he had never read it and was unaware of its contents; and the Commonwealth introduced as witnesses John Sturgill, the county court clerk and former deputy sheriff of Knott County, and W. R. Smith, a bank cashier of Hindman, who testified that there was no more feeling among the residents of the County concerning this case than is usual in any murder case and that they believed the accused

could obtain a fair trial in Knott County. It should be noted that Mrs. McCoy also added to the statements contained in her affidavit that the man whom she had employed to drive her to Hindman on the day of the hearing had put her out of the car before daylight and returned home because "they had sent him word not to come back here any more."

At the July term of court the appellant and those indicted with him renewed their motion for a change of venue, and filed in support of their motion the affidavit of Martin Hall and Miranda Hall in statutory form, stating that they had read the petition for a change of venue and believed the statements therein to be true. The accused also moved to require the presiding judge to vacate the bench because of his relationship to the deceased; the motion was sustained, and this court designated the Honorable Robert Friend to preside. The special judge then ordered an oral hearing on the petition for a change of venue at which the Commonwealth introduced as witnesses Henry Sturgill, ex-sheriff, Alonzo Young, also an ex-sheriff, Robert Combs, county judge, and Ellis Hopkins, the father of the deceased. It should perhaps be noted that the father of the deceased was a popular Baptist minister, and although affiliated with the minority political party, was related to the Halls, who were members of the majority party and described by one of the witnesses as one of the biggest political factions in the County. At the conclusion of the hearing the Court overruled the renewed motion and petition for a change of venue, but sustained a motion of the Commonwealth to obtain a jury from a county other than Knott County, and directed the Sheriff to summon a jury from Wolfe County.

A careful study of the affidavits filed and of the testimony introduced at the two hearings convinces us that no error was committed by either the regular or the special judge in denying a change of venue. There was an entire absence of any evidence of any violence threatened or attempted against the accused, and no substantial evidence indicating that public feeling had been aroused to an extent which would have deprived the accused of a fair and impartial trial. Besides, it has long been the law of this state that the discretion of the trial judge in refusing to grant a change of venue will not be interfered with unless abused, and no abuse is shown here. Commonwealth v. Kelly, 266 Ky. 662, 99

S. W. (2d) 774; Bradley v. Commonwealth, 204 Ky. 635, 265 S. W. 291, and authorities cited in the latter opinion.

While our sympathies are touched by the distressing plight of one so young in years, we have no doubt of appellant's guilt, and, moreover, that question was for the jury, not us, to answer. It does not appear that any error prejudicial to his substantial rights was committed by the trial court, and hence we have no alternative but to affirm its judgment.

Judgment affirmed.